## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**JOE S. MORA**,

        Plaintiff,

      vs.                               No.    **CIV 04-884 MCA/RHS**

**CITY OF ALBUQUERQUE**,
**SOLID WASTE DEPARTMENT**,
**SCOTT RUIZ**, in his official and
individual capacity,

        Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on ***Defendant's Motion for Summary Judgment*** [Doc. No. 45] filed on June 30, 2005. Having considered the parties' submissions, the relevant law, and otherwise being fully advised in the premises, the Court grants Defendants' motion and dismisses with prejudice Plaintiff's claims of discrimination and retaliation under Title VII of the Civil Rights Act. Plaintiff's state-law claims are dismissed without prejudice for lack of subject-matter jurisdiction.

## I.    BACKGROUND

On August 4, 2004, Plaintiff filed this civil action against his employer, Defendants City of Albuquerque and Solid Waste Department, and an Assistant Superintendent in the Department's Residential Division, Defendant Scott Ruiz. [Doc. No. 1.] Plaintiff is Hispanic, and his *Complaint* alleges that Defendants discriminated and retaliated against him

in violation of Title VII of the Civil Rights Act, 42 U.S.C. §§ 2000e to 2000e-17.  Plaintiff's *Complaint* also asserts claims for breach of contract and breach of an implied covenant of good faith and fair dealing under state law.

On June 30, 2005, Defendants filed a motion for summary judgment as to all of Plaintiff's claims.  The undisputed facts and evidence of record relating to Defendants' motion can be summarized as follows.

Plaintiff has been employed by Defendant City of Albuquerque since 1994; he has been employed with the City's Solid Waste Management Department (SWMD) in various positions since 1999.  In December 2003, the City employed Plaintiff in the SWMD as a recycling truck driver.  [Mora Dep. at 5-7.]  During that month, a controversy arose over the SWMD's semi-annual collection of residential yard waste, known as "green waste."  [Ex.12 to Mora Dep. attached as Ex. A to Doc. 46; Ruiz Aff. ¶¶ 2-16; Ex. 4 to Doc. 54.]

Before December 2003, the semi-annual collection of green waste was performed by SWMD's Weed and Litter Division and generally did not involve Plaintiff or other recycling truck drivers.  [Ruiz Aff. ¶ 2.]  The recycling truck drivers were operating under an "incentive plan" which assigned each driver a particular route and allowed the drivers to leave work as soon as they finished their recycling routes for the day.  Under the incentive plan, the drivers were paid for eight hours of regular work time even if they finished their routes early, and it was not uncommon for recycling truck drivers, including Plaintiff, to finish their routes by 11:00 a.m.  After their routes were completed, the drivers also had the

option of doing additional work, for which they were compensated at an overtime rate. [Mora Dep. at 15-16, 37, 54, 135-36; Gutierrez Dep. at 32.]

Under the City's incentive plan, the time it took for a recycling truck driver to complete his or her route on a particular date depended on a number of factors, including the number of persons on that route who participated in the SWMD's recycling program, the volume of materials they set out for recycling, and whether the driver's truck broke down or encountered traffic problems, road construction, or inclement weather.  Thus, at the beginning of each work day, the recycling truck drivers did not know exactly how long it would take them to complete their routes on a particular date.  [Mora Dep. at 37-41, 53-54; 136, 216-17; Ex. 2 to Doc. 54.]

For a period of one or two weeks beginning on December 1, 2003, the SWMD altered the recycling truck drivers' work schedule by directing them to collect green waste each day after they completed their recycling routes.  In other words, the SWMD transferred its semi-annual green-waste pickup from the Weed and Litter Division and added it to the existing, somewhat unpredictable workload of the recycling truck drivers.  [Mora Dep. at 24-25; Ruiz Aff. ¶ 2.]  The workload for green-waste collection also could be somewhat unpredictable for the same reasons that applied to recycling:  in addition to the potential for inclement weather, traffic, construction, or mechanical problems, the drivers did not know in advance how many of the City's residents within their routes would be participating in the green-waste collection or what volume of green-waste they would leave out for collection on a particular date.  [Mora Dep. at 37-41, 53-54, 216-17; Baca Dep. at 23-24.]

-3-

The SWMD offered the recycling truck drivers additional compensation at the overtime rate, plus the assistance of an additional worker (called a "rabbit"), to handle the extra workload caused by the green-waste collection. [Ruiz Aff. ¶ 5.] Despite these measures, most of the recycling truck drivers did not complete their daily green-waste routes in December 2003. Instead, the SWMD was forced to borrow personnel from other divisions and work over the weekend to complete the green-waste collection that month. [Mora Dep. at 257-58; Ruiz Aff. ¶¶ 26, 28, 30.] The parties dispute the reasons why this happened.

According to Plaintiff and some of the other recycling truck drivers, there simply was not enough time or resources for the recycling truck drivers and their "rabbits" to safely complete their green-waste routes on their own in December 2003, and the recycling truck drivers were not adequately compensated for this task. Plaintiff, as well as other recycling truck drivers, expressed these concerns to the management of the SWMD, including Defendant Ruiz, before and during the green-waste pickup that month. [Mora Dep. at 32-33, 70-81; Baca Dep. at 9-17, 25; Ex. 12 to Mora Dep. attached as Ex. A to Doc. 46; Ruiz Aff. ¶¶ 7-12.]

Defendants contend that the reasons asserted by Plaintiff and some of the other recycling truck drivers were not the only reasons for the difficulty in completing the green-waste collection on time in December 2003. According to Defendants, a group of recycling truck drivers, including Plaintiff, engaged in a work "slowdown" to protest the level of compensation they were receiving for the green-waste collection. Defendants assert that this

work "slowdown" was a factor that contributed significantly to the delay in completing the green-waste collection in December 2003.

On or about Friday, December 5, 2003, Defendants launched an investigation into the alleged "slowdown" based on a comment that a temporary worker, Mateo Becerra, made to Defendant Ruiz.  [Ruiz Dep. at 50, 54-56; Ruiz Aff. ¶¶ 17-19; Becerra Aff. ¶ 13.]  Mr. Becerra was working as a "rabbit" for one of the other recycling truck drivers during the first week of the December 2003 green-waste collection, and he overheard comments by that driver which led him to believe that a group of the drivers (including Plaintiff) were involved in a work slowdown.  [Ruiz Aff. ¶ 17; Becerra Aff. ¶¶ 1-12.]  Mr. Becerra's comments also led Defendants to investigate an incident on Tuesday afternoon, December 2, 2003, in which Plaintiff and about four other recycling truck drivers allegedly parked their trucks, stopped working, and congregated around a convenience store for a significant period of time.  Defendants subsequently hired an outside investigator who interviewed several persons who witnessed the recycling trucks in the area of the convenience store on that Tuesday afternoon.  [Ruiz Aff. ¶¶ 20-21; Ruiz Dep. at 50-51.]

On December 8, 2004, while the investigation was ongoing, Defendant Ruiz met with Plaintiff and asked him if he had finished his green-waste collection for the preceding Wednesday.  Plaintiff replied that he had not.  Defendant Ruiz then reassigned Plaintiff an older model recycling truck in place of the newer model he had been using at that time.  The newer model truck that Plaintiff had been using was reassigned to another Hispanic driver (Ken Zubia) who had finished his green-waste routes, and that truck was returned to Plaintiff

about three months later.  [Handwritten notes attached to Ex. 24 to Doc. 54; Mora Dep. at 22, 30-31, 103-04, 118-19, 157; Ruiz Aff. ¶¶ 38-39.]

The parties dispute the reasons for this reassignment.  Plaintiff felt that being reassigned to an older model recycling truck was a loss of prestige, and he later alleged that Defendant Ruiz's motives for this reassignment were discriminatory or retaliatory.  [Mora Dep. at 22, 157.]  Defendant Ruiz, on the other hand, claims that he reassigned an older model truck to Plaintiff in response to a complaint from Plaintiff that the newer truck was interfering with his ability to collect waste efficiently; Defendant Ruiz thought the older truck would allow Plaintiff to work more efficiently.  [Ruiz Aff. ¶¶ 38-39.]

On the morning of December 12, 2004, Defendant Ruiz took Plaintiff to a room where the outside investigators were present, and they questioned him about the Tuesday incident at the convenience store and the alleged work slowdown.  Plaintiff admitted that he stopped at the convenience store but denied that the stop lasted longer than a normal rest break or that it was motivated by any desire to cause a slowdown in the green-waste collection.  [Ex. 12 to Mora Dep. attached as Ex. A to Doc. 46; Mora Dep. at 112-15 .]  Other employees involved in the incident made similar statements denying any work slowdown.  [Baca Dep. at 45-48, 97-100; Navarette Dep. at 28; Ex. 8 to Doc. 54.]

There were other individuals interviewed by the investigators who contradicted Plaintiff's version of the Tuesday incident at the convenience store.  In particular, one of the interviewees who worked at a nearby office stated that she saw the recycling truck drivers parked at that location from some time between 3:15 p.m. and 3:45 p.m until she left work

sometime around 5:00 p.m. or 5:05 p.m.--an amount of time that is not consistent with a standard break period.   [Wright Dep. at 3-7.]  Plaintiff responds that even if the Tuesday incident lasted longer than a single rest break, the drivers were entitled to combine the rest and lunch breaks they accumulated into a single, longer break at the end of the work day. [Mora Dep. at 107; Gutierrez Dep. at 24; Ex. 10, 11 to Doc. 54.]

On January 8, 2004, Plaintiff's counsel faxed a letter to Defendants in which he alleged for the first time that Defendants were discriminating against him because he is Hispanic and retaliating against him because of his "perceived involvement in union activities."  [Ex. 24 to Doc. 54.]   The letter from Plaintiff's counsel also challenged the procedures Defendants and their investigators used in interviewing Plaintiff on the grounds that these procedures violated due process and were not in accordance with Plaintiff's union contract.

In a memorandum dated January 29, 2004, Defendant Ruiz gave Plantiff formal written notice of a "pre-determination hearing" on charges that Plaintiff violated City rules and regulations by failing to devote his time and resources to completing his green-waste routes during the week of December 1-5, 2003, falsifying his time records for that week, and giving false statements to investigators.  [Ex. 8 to Mora Dep. attached as Ex. A to Doc. 46.] Plaintiff's counsel responded with a second letter dated February 3, 2004, in which he accused Defendants of violating Plaintiff's civil rights under Title VII of the Civil Rights Act, as well as violating state law.

In a memorandum dated February 12, 2004, the SWMD's Director stated that Plaintiff would receive a thirty (30) workday non-pay suspension as a result of the violations found at the pre-determination hearing.  [Ex. 9 to Mora Dep attached as Ex. A to Doc. 46.] Plaintiff appealed the thirty-day suspension pursuant to his union contract, and the matter was heard by an arbitrator in July 2005.  [Mora Dep. at 108; Doc. 46, at ¶¶ 47-48; Doc. 52, at ¶¶ 47-48.]  In April 2004, Plaintiff also submitted a charge to the Equal Employment Opportunity Commission (EEOC) [Mora Dep. at 160-61], and the parties do not dispute that he exhausted his administrative remedies prior to filing this civil action on August 4, 2004.

Plaintiff remains employed by the SWMD during the pendency of this action.  Around July 2004, he voluntarily transferred to another position as a driver of an "automated" truck assigned to the collection of residential waste, rather than recycling.  Plaintiff does not allege that this lateral transfer to the "automated" division is an adverse employment action.  [Mora Dep. at 86-87.]

Nevertheless, Plaintiff has identified a few instances in which he believes Defendants have continued to engage in discriminatory or retaliatory conduct.  In particular, he claims that Defendant Ruiz declined to shake his hand two or three times [Mora Dep. at 87-88, 225-26], and he has complained about the frequency with which he is designated as "acting foreman" or assigned to train other employees while working in the "automated" division. [Mora Dep. at 83-91.] Defendants respond that Plaintiff has not identified any non-Hispanic employees who were made acting foreman or given training assignments more often.

According to Defendants, such assignments were based on seniority or other legitimate factors. [Ruiz Aff. ¶¶ 41-42.].

## II.    ANALYSIS

### A.    Standard of Review

Under Fed. R. Civ. P. 56(c), the Court may enter summary judgment when the motion papers, affidavits, and other evidence submitted by the parties show that no genuine issue exists as to any material fact and that the moving party is entitled to judgment as a matter of law.  A "genuine issue" exists where the evidence before the Court is of such a nature that a reasonable jury could return a verdict in favor of the non-moving party as to that issue.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-52 (1986).  A fact is "material" if it might affect the outcome of the case.  See id. at 248.  Judgment is appropriate "as a matter of law" if the non-moving party has failed to make an adequate showing on an essential element of its case, as to which it has the burden of proof at trial.  See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 670-71 (10th Cir. 1998).

In order to warrant consideration by the Court, the factual materials accompanying a motion for summary judgment must be admissible or usable at trial (although they do not necessarily need to be presented in a form admissible at trial).  See Celotex Corp., 477 U.S. at 324; Wright-Simmons v. City of Okla. City, 155 F.3d 1264, 1268 (10th Cir. 1998).  Thus, "[h]earsay testimony cannot be considered" in ruling on a summary-judgment motion.  Gross v. Burggraf Constr. Co., 53 F.3d 1531, 1541 (10th Cir. 1995); see also Starr v. Pearle Vision,

Inc., 54 F.3d 1548, 1555 (10th Cir. 1995).  In addition, the Court may disregard an affidavit that contradicts the affiant's own sworn deposition testimony if the Court finds that such an affidavit constitutes an attempt to create a "sham fact issue."  Kendrick v. Penske Transp. Servs., Inc., 220 F.3d 1220, 1223 n.2 (10th Cir. 2000) (citing Franks v. Nimmo, 796 F.2d 1230, 1237 (10th Cir. 1986)).

In this case, the parties have submitted exhibits and deposition testimony that contain hearsay and hearsay within hearsay.  In reviewing these materials to determine whether Defendants are entitled to summary judgment, the Court does not consider statements that affiants or deponents attribute to others for the purpose of proving the truth of the matters asserted therein, except for admissions by a party opponent (or agent thereof) which the affiant or deponent witnessed.  See Fed. R. Evid. 801(d)(2); Wright-Simmons, 155 F.3d at 1268; Pastran v. K-Mart Corp., 210 F.3d 1201, 1203 n.1 (10th Cir. 2000).  The Court does, however, consider statements attributed to third parties for other admissible purposes.  In particular, such statements may be considered for the limited purpose of showing their effect on the listener or the declarant's state of mind.  See Faulkner v. Super Valu Stores, Inc., 3 F.3d 1419, 1434 (10th Cir. 1993) (effect on the listener); Wright v. Southland Corp., 187 F.3d 1287, 1304 n.21 (11th Cir. 1999) (declarant's state of mind); Pastran, 210 F.3d at 1203 n.1 (similar).  They also may be considered as verbal acts or operative facts when legal consequences flow from the utterance of the statements.  See generally Echo Acceptance Corp. v. Household Retail Servs., Inc., 267 F.3d 1068, 1087 (10th Cir. 2001).

Apart from these limitations imposed by the Federal Rules of Evidence, it is not the Court's role to weigh the evidence, assess the credibility of witnesses, or make factual findings in ruling on a motion for summary judgment.  Rather, the Court assumes the admissible evidence of the non-moving party to be true, resolves all doubts against the moving party, construes all admissible evidence in the light most favorable to the non-moving party, and draws all reasonable inferences in the non-moving party's favor.  See Hunt v. Cromartie, 526 U.S. 541, 551-52 (1999).

With their reply brief in this case, Defendants have submitted additional evidence in the form of an affidavit by Dennis Pratt.  [Ex. G to Doc. 56.]  The general rule is that when a movant submits additional evidence in support of summary judgment after the filing of the non-movant's response, district courts have the option of either disregarding that additional evidence or providing the non-movant with the opportunity to file a surreply.  See Beaird v. Seagate Tech., Inc., 145 F.3d 1159, 1163-65 (10th Cir. 1998).  In this case, I elect to disregard the additional evidence submitted with Defendants' reply brief in lieu of affording Plaintiff an opportunity to file a surreply because Defendants are entitled to summary judgment even in the absence of this additional evidence.

**B.**     **Plaintiff's Title VII Claims Against Defendant Ruiz and SWMD**

As an initial matter, the Court notes that Defendant Ruiz is not a proper defendant with respect to Plaintiff's claims under Title VII of the Civil Rights Act because this statute does not impose liability on individual employees.  See Haynes v. Williams, 88 F.3d 898, 901 (10th Cir. 1996); cf. Butler v. City of Prairie Village, 172 F.3d 736, 744 (10th Cir. 1999)

-11-

(collecting cases). Similarly, Plaintiff's claim against Defendant SWMD or the "Solid Waste Department" is superfluous because Plaintiff has not shown that this Defendant is a legal entity that may be held liable apart from the municipal corporation of which it is part. <u>See Diaz v. Second Jud. Dist. Ct.</u>, Civ. No. 00-700 JC/DJS, slip. op. at 8-9 (D.N.M. Aug. 1, 2001). Plaintiff does not address these points in his response to Defendants' motion.

Accordingly, I conclude that Defendants Ruiz and SWMD are entitled to summary judgment on both of Plaintiff's Title VII claims on these grounds alone. To the extent that the law permits Plaintiff to bring Title VII claims against Defendants Ruiz or SWMD, I also conclude, in the alternative, that these Defendants are entitled to summary judgment on those claims for the same reasons articulated below with respect to Defendant City of Albuquerque.

### C.      <u>Plaintiff's Title VII Claims Against Defendant City of Albuquerque</u>

Counts 1 and 2 of Plaintiff's *Complaint* allege that Defendant City of Albuquerque discriminated against him because he is Hispanic and retaliated against him for asserting a claim of race or national-origin discrimination.[1] Title VII of the Civil Rights Act "makes it an 'unlawful employment practice for an employer . . . to discriminate against any individual . . . , *because of* such individual's race, color, religion, sex, or national origin.'" <u>Desert

---

[1]Plaintiff's *Complaint* refers to discrimination on the basis of national origin, while some portions of his deposition testimony refer to racial discrimination. For purposes of this *Memorandum Opinion and Order*, the Court need not resolve whether the word "Hispanic" refers to a racial classification or a classification based on national origin. The same legal standard applies to both classifications under Title VII. <u>See generally</u> <u>Bennun v. Rutgers State Univ.</u>, 941 F.2d 154, 170-73 (3rd Cir. 1991).

Palace, Inc. v. Costa, 539 U.S. 90, 92 (2003) (quoting 42 U.S.C. § 2000e-2(a)(1)) (emphasis added).  Title VII also makes it "an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter . . . or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3(a).

Plaintiff may prove his Title VII claims through direct or circumstantial evidence.  See Desert Palace, Inc., 539 U.S. at 99-100; Kendrick, 220 F.3d at 1225.  To the extent he relies on circumstantial evidence, Defendant's summary-judgment motion is to be evaluated according to the burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).  See Amro v. Boeing Co., 232 F.3d 790, 796 (10th Cir. 2000).  Under this framework, the employee must establish a *prima facie* case of unlawful discrimination or retaliation in order to survive a motion for summary judgment.  If the employee establishes a *prima facie* case, then the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for the employment decision that is alleged to be unlawful.  If the employer meets this burden, then summary judgment is warranted unless the employee can show that there is a genuine issue of material fact as to whether the reasons preferred by the employer are pretextual or whether his race, gender, or other illegal consideration was a motivating factor in the employment decision.  See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147-49 (2000); Kendrick, 220 F.3d at 1226.

There are at least two forms of discrimination or retaliation involving race or national origin that are actionable under Title VII: disparate treatment and the creation of a hostile work environment. See generally Trujillo v. Univ. of Colo. Health Sciences Ctr., 157 F.3d 1211 (10th Cir. 1998) (reviewing hostile work environment, disparate treatment, and retaliation claims); Gunnell v. Utah Valley State Coll., 152 F.3d 1253, 1264-65 (10th Cir. 1998) (reviewing a claim for a retaliatory hostile work environment). In response to Defendants' summary-judgment motion in this case, Plaintiff presents no authority or argument in support of a hostile work environment claim. Cf. Adler, 144 F.3d at 672 ("[T]he requirement that the nonmovant specifically reference facts in its motion materials and the record is of special importance in an employment discrimination case."); Pelfresne v. Village of Williams Bay, 917 F.2d 1017, 1023 (7th Cir. 1990) ("A litigant who fails to press a point by supporting it with pertinent authority, or by showing why it is sound despite a lack of supporting authority or in the face of contrary authority, forfeits the point."). Accordingly, the Court's focus is on Plaintiff's claim of disparate treatment.

### 1.     Plaintiff's Title VII Discrimination Claim

In order to establish a prima facie case of race or national-origin discrimination in the form of disparate treatment, Plaintiff generally must show (1) that he is a member of a protected class based on his race or national origin, (2) that he suffered an adverse employment action, and (3) that similarly situated employees were treated differently. See Trujillo, 157 F.3d at 1215. In determining whether these general requirements are satisfied, the Court recognizes that the elements of a *prima facie* case are to be measured by "a flexible

standard that may be modified to accommodate different factual situations." <u>Perry v. Woodward</u>, 199 F.3d 1126, 1140 n.10 (10th Cir. 1999) (citing <u>Int'l Bhd. of Teamsters v. United States</u>, 431 U.S. 324, 358 (1977)).  On the other hand, "Title VII does not make unexplained differences in treatment per se illegal nor does it make inconsistent or irrational employment practices illegal.   It prohibits only intentional discrimination based upon an employee's protected class characteristics" of race, color, religion, sex, or national origin. <u>EEOC v. Flasher Co.</u>, 986 F.2d 1312, 1319 (10th Cir. 1992).

In this case, it is undisputed that Plaintiff is Hispanic and that the thirty-day suspension he received is an "adverse employment action."  Further analysis is required, however, to determine whether any other discrete acts by Defendants constituted "adverse employment actions," and whether any of such actions evince a difference in treatment among similarly situated employees.

While the Tenth Circuit liberally defines the term "adverse employment action" in disparate-treatment cases to encompass more than just "monetary losses in the form of wages or benefits," this definition does not include "'a mere inconvenience or an alteration in [Plaintiff's] job responsibilities.'" <u>Sanchez v. Denver Pub. Sch.</u>, 164 F.3d 527, 532 (10th Cir. 1998) (quoting <u>Crady v. Liberty Nat'l Bank & Trust Co.</u>, 993 F.2d 132, 136 (7th Cir.1993)).  This definition also does not include actions which "had, at best, a de minimis effect on [the employee's] future employment opportunities." <u>Aquilino v. Univ. of Kan.</u>, 268 F.3d 930, 934 (10th Cir. 2001).  "Speculative harm does not constitute adverse employment action." <u>Id.</u> at 936.

-15-

It follows that changes in work assignments, criticism by a supervisor, or other negative comments about an employee that do not cause any present or foreseeable future economic injury are not adverse employment actions, regardless of the fact that they may result in feelings of diminished prestige.  See Davis v. Town of Lake Park, 245 F.3d 1232, 1240-45 (11th Cir. 2001); accord Primes v. Reno, 190 F.3d 765, 767  (6th Cir. 1999). Investigations prompted by allegations of employee misconduct also do not constitute adverse employment actions when they are performed in a routine manner following the regular and legitimate practices of the employer.  See Stockett v. Muncie Indiana Transit Sys., 221 F.3d 997, 1001-02 (7th Cir. 2000) (discussing a requirement that an employee submit to a drug test).

Applying these authorities to the undisputed facts and evidence of record in this case, I conclude that the following actions attributed to Defendants in Plaintiff's deposition testimony do not qualify as "adverse employment actions" under Title VII:  (1) reassigning Plaintiff to an older-model recycling truck for a three-month period; (2) the alleged decrease in the frequency with which Plaintiff is designated as "acting foreman" or assigned to train other employees [Mora Dep. at 83-86?; Ruiz Aff. ¶ 41]; (3) Defendant Ruiz's act of not shaking Plaintiff's hand two or three times [Mora Dep. at 87-88, 225-26].[2]  I also conclude that Defendants' investigation of the alleged work slowdown during the December 2003

---

[2]Plaintiff's response to Defendant's summary-judgment motion focuses on the investigation and suspension, and does not present any additional evidence or authority to support an argument that other incidents amounted to "adverse employment actions" under Title VII.

green-waste collection, in and of itself, does not constitute an "adverse employment action" under Title VII.

On the other hand, there is no question that the thirty-day suspension of Plaintiff's employment constitutes an "adverse employment action" under the authorities cited above. To the extent that events which preceded this action (such as the initial investigation of the alleged work slowdown) are relevant to determining the reasons or motives for Plaintiff's thirty-day suspension, they also may be considered in the Court's analysis. See Martinez v. Potter, 347 F.3d 1208, 1211 (10th Cir. 2002).

With respect to his thirty-day suspension, Plaintiff asserts that other similarly situated non-Hispanic employees were treated differently because they received lesser degrees of discipline for more egregious misconduct. To support this assertion, Plaintiff contends that he along with three or four other Hispanic recycling truck drivers were the only ones reprimanded, investigated, or disciplined with regard to the controversy surrounding the December 2003 green-waste collection. In contrast, Plaintiff contends that there were three non-Hispanic drivers who did not complete all their green-waste routes during that period and who were not reprimanded, investigated, or disciplined with regard to that controversy. [Mora Dep. at 65-66.] Defendants respond to these contentions by pointing out that all of the recycling truck drivers involved in the Tuesday incident at the convenience store were Hispanic. Defendants further contend that the non-Hispanic recycling truck drivers are not similarly situated because they did not participate in this incident, and no one witnessed them

make any comments that suggested a deliberate slowdown in their work. [Ruiz Aff. ¶¶ 20, 24; Ruiz Dep. at 54-57; Becerra Aff. ¶¶ 7-12.]

Plaintiff also contends that the only recycling truck driver who completed all of his green-waste routes in December 2003 was Hispanic. Although that driver was not reprimanded, investigated, or disciplined with regard to the December 2003 green-waste controversy, his employment was later terminated for other reasons. [Ex. 27 to Doc. 54.] Again, Defendants respond that the driver in question was not similarly situated because he completed green-waste his routes on time that month [Mora Dep. at 30-31], and the discipline later imposed on him bears no relationship to the green-waste controversy in December 2003 or the fact that he is Hispanic.

Apart from the December 2003 green-waste controversy, Plaintiff points to alleged instances of leniency by the SWMD in disciplining non-Hispanic employees for other misconduct. This other misconduct by non-Hispanic employees involved alleged violations of the City's drug and alcohol policy, salvaging materials collected by SWMD, and stealing a co-worker's bag. [Ex. 16, 18, 19, 20 to Doc. 52; Gutierrez Dep. at 13-21.] Defendants respond that many of these allegations are based on unsubstantiated hearsay. [Mora Dep. at 62-65.] And, in any event, Defendants claim the employees in question are not similarly situated to Plaintiff because they have different supervisors and/or violated different work rules. [Ruiz Dep. at 51-54; Ex. F to Doc. 46.]

Viewing the admissible evidence of record in the light most favorable to Plaintiff, I agree with Defendants that Plaintiff is not similarly situated to the non-Hispanic employees

whom he claims were treated differently.  "An employee is similarly situated to the plaintiff if the employee deals with the same supervisor and is subject to the 'same standards governing performance evaluation and discipline.'"  Kendrick, 220 F.3d at 1232 (quoting Aramburu v. Boeing Co., 112 F.3d 1398, 1404 (10th Cir. 1997)).  "A court should also compare the relevant employment circumstances, such as work history and company policies, applicable to the plaintiff and the intended comparable employees in determining whether they are similarly situated."  Aramburu, 112 F.3d at 1404; accord Kendrick, 220 F.3d at 1232.

In this case, the non-Hispanic employees who allegedly violated the City's drug and alcohol policy, salvaged materials collected by SWMD, or stole a co-worker's bag, are not similarly situated to Plaintiff because these employees do not have the same supervisor as Plaintiff and their alleged misconduct involves different standards governing performance evaluation and discipline.  See Rivera v. City and County of Denver, 365 F.3d 912, 923-24 (10th Cir. 2004).  In particular, "'[a]lcohol-related offenses are not the same type of misconduct as falsification of records.'"  Id. (quoting Hiatt v. Rockwell Int'l Corp., 26 F.3d 761, 771 (7th Cir.1994)).  Also, in several instances Plaintiff has failed to come forward with admissible evidence identifying the circumstances of the alleged misconduct and the work history of the employees in question.  See Salguero v. City of Clovis, 366 F.3d 1168, 1177 n.4 (10th Cir. 2004) (noting that assertions not supported in the record are "insufficient to create a genuine question of material fact as to pretext").

Plaintiff's claims may not suffer from the same evidentiary defects with respect to the other recycling truck drivers who were not investigated or disciplined during the December 2003 green-waste controversy. These drivers appear to share the same supervisor and to be subject to the same standards governing performance evaluation and discipline. They are not similarly situated to Plaintiff with respect to the thirty-day suspension at issue here, however, because there is no evidence in the record that these other employees violated the same or similar standards and policies which resulted in this discipline.

In this regard, there is a significant distinction between the failure to complete the assigned green-waste collection because an employee is *unable* to do so, and the failure to complete the assigned green-waste collection because an employee is *unwilling* to do so or *dishonest* about his or her reasons for not doing so. Most of the alleged violations of City standards or policies that formed the basis for Plaintiff's thirty-day suspension had to do with his apparent *unwillingness* to complete that task, as evidenced by his failure to use his recycling truck to perform his assigned duties during the period when the vehicle was parked at the convenience store on Tuesday afternoon. The remaining allegations that resulted in Plaintiff's thirty-day suspension had to do with his *dishonesty* in falsifying time records (*i.e.*, claiming compensation for time that he was not actually working), making false statements during the investigation of the alleged work slowdown, and failing to timely inform his supervisor that he had not completed some of his green-waste routes. [Ex. 8 to Mora Dep. attached as Ex. A to Doc. 46.]

The non-Hispanic recycling truck drivers were not charged with violating the above standards and policies because there is no evidence in the record that any of them were involved in the Tuesday incident at the convenience store or were implicated in the comments that Mr. Becerra reported to Defendant Ruiz.  Rather, all of the drivers who stopped at the convenience store on Tuesday afternoon were Hispanic, and all of the comments about a work slowdown that Mr. Becerra reported to Defendant Ruiz were made by Hispanic employees.

Thus, there is no evidence that the non-Hispanic recycling-truck drivers' failure to complete their assigned green-waste collection was caused by their *unwillingness* to do so, or that they were *dishonest* as to the amount of work they claimed to have performed. Absent such evidence that the failure to complete the assigned green-waste collection was caused by an unwillingness to do so, or that it was compounded by dishonesty, any standards or policies the non-Hispanic recycling truck drivers may have violated as a result of the failure to complete this task were not of "comparable seriousness." Kendrick, 220 F.3d at 1232; accord Rivera, 365 F.3d at 924.

For these reasons, I conclude that Plaintiff has not come forward with the admissible evidence necessary to support a reasonable inference that similarly situated non-Hispanic employees were treated differently for purposes of his Title VII claim.  It follows that Plaintiff has not established a *prima facie* case of race or national-origin discrimination, and Defendants are entitled to summary judgment on Plaintiff's Title VII discrimination claim.

I also conclude, in the alternative, that even assuming for purposes of analysis that Plaintiff has established a *prima facie* case of unlawful discrimination under Title VII, Defendants have articulated facially legitimate, nondiscriminatory reasons for the actions they took regarding Plaintiff's employment.  In particular, the reasons stated in the Notice of Pre-Determination Hearing that resulted in Plaintiff's thirty-day suspension are facially legitimate and nondiscriminatory.  Cf. Elmore v. Capstan, 58 F.3d 525, 531 (10th Cir. 1995) (concluding that employer had facially legitimate, nondiscriminatory reason for imposing discipline on employee who "failed to call in sick until the third day of his absence and submitted a falsified return-to-work slip a week later when he finally did return to work").

Thus, it becomes Plaintiff's burden to show that these reasons are pretextual or that his race or national origin were nevertheless a motivating factor in Defendants' decision to suspend his employment for thirty days.  I conclude that Plaintiff has not met his burden of showing a genuine issue of material fact as to whether the reasons proffered by the employer are pretextual or whether his race or national origin was a motivating factor in the employment decision.  See Reeves, 530 U.S. at 147-49; Kendrick, 220 F.3d at 1226.

A plaintiff in a Title VII case can show pretext by presenting evidence that the reasons proffered by the employer are so weak, implausible, inconsistent, incoherent, or contradictory as to support a reasonable inference that the employer did not act for those reasons.  See Morgan v. Hilti, Inc., 108 F.3d 1319, 1323 (10th Cir. 1997).  In particular, such pretext may be shown by evidence concerning the "prior treatment of plaintiff; the employer's policy and practice regarding minority employment (including statistical data);

-22-

disturbing procedural irregularities (e.g., falsifying or manipulating hiring criteria); and the use of subjective criteria."  Simms v. Okla. ex rel. Dep't of Mental Health & Substance Abuse Servs., 165 F.3d 1321, 1328 (10th Cir. 1999).  Pretext also may be shown:

> (1) with evidence that the defendant's stated reason for the adverse employment action was false; (2) with evidence that the defendant acted contrary to a written company policy prescribing the action to be taken by the defendant under the circumstances; or (3) with evidence that the defendant acted contrary to an unwritten policy or contrary to company practice when making the adverse employment decision affecting the plaintiff.

Kendrick, 220 F.3d at 1230 (citations omitted).  In addition, statements by a decision-maker that evince a discriminatory or retaliatory motive for an employment action may be used to show pretext under the McDonnell Douglas framework so long as there is some nexus between the statements and the employment action taken against the employee.  See  English v. Colo. Dep't of Corr., 248 F.3d 1002, 1010 (10th Cir. 2001);  Shorter v. ICG Holdings, Inc., 188 F.3d 1204, 1209-10 (10th Cir. 1999), overruled in part on other grounds by Desert Palace, Inc., 539 U.S. at 99-100; McKnight v. Kimberly Clark Corp., 149 F.3d 1125, 1129 (10th Cir. 1998).

       To show pretext or other improper motivation in this case, Plaintiff primarily relies on the presence of disputed facts concerning the truth of the allegations that led to his thirty-day suspension.  In other words, Plaintiff contends that Defendants should have believed the evidence he presented to show that no work slowdown occurred and that the rest break he and other drivers took on Tuesday afternoon was not excessive or improper.  Because Defendants instead chose to believe other witnesses who contradicted Plaintiff's testimony

on these issues, Plaintiff contends that Defendants erroneously relied on inaccurate evidence to support their decision to impose the thirty-day suspension.

I agree with Plaintiff that there is a factual dispute concerning the degree to which the failure to complete the December 2003 green-waste collection was caused by a work slowdown as opposed to other factors, such as a large volume of green waste to be collected or an inadequate amount time and resources to complete this task. Viewing the evidence of record in the light most favorable to Plaintiff, it could be the case that Defendants simply miscalculated the amount of lost time or uncompleted work attributable to a work slowdown as opposed to other factors. It could also be the case that some of the factual differences between Plaintiff's version of what he did during the December 2003 green-waste collection and the version(s) given by other witnesses are the result of differences in recollection rather than intentional dishonesty.

These factual disputes regarding the sufficiency of the evidence used to support Defendants' decision to suspend Plaintiff's employment may be of central relevance to the pending arbitration proceeding or other post-termination administrative proceedings in which Defendants may bear the burden of proving that Plaintiff's suspension was supported by "just cause." See generally Herrera v. City of Albuquerque, 198 F.3d 258, 1999 WL 815815, at *2 (10th Cir. Oct. 13, 1999) (unpublished disposition noting the post-deprivation procedures available under the City of Albuquerque's Merit System Ordinance or collective-bargaining agreements between labor unions and the City); cf. Walck v. City of Albuquerque, 113 N.M. 533, 536, 828 P.2d 966, 969 (Ct. App. 1992) (affirming a district court's reversal of an

employee's termination based on a lack of substantial evidence to support a "just cause" determination).

It does not follow, however, that Defendants' stated reasons for suspending Plaintiff's employment for thirty days are merely a pretext used to hide an underlying racial animus against Hispanic employees.   Unlike the City's Merit System Ordinance or collective-bargaining agreements, Title VII is not a "'civil service statute [that] requires every employer to have good reasons for its deeds.'"   Neal v. Roche, 349 F.3d 1246, 1252 (10th Cir. 2003) (quoting Benzies v. Illinois Dep't of Mental Health & Developmental Disabilities, 810 F.2d 146, 148 (7th Cir. 1987)); accord Flasher Co., 986 F.2d at 1312.   The relevant prohibitions in Title VII of the Civil Rights Act are limited to invidious discrimination on the basis of race, color, religion, sex, or national origin, and do not encompass the broader concept of "just cause."

Thus, for purposes of a claim of discrimination under Title VII, "[a]n articulated motivating reason is not converted into pretext merely because, with the benefit of hindsight, it turned out to be poor business judgment." McKnight, 149 F.3d at 1129.   Evidence that Defendants were simply wrong or mistaken in concluding that Plaintiff engaged in a work slowdown or was dishonest is not sufficient to show that Defendants' reasons are pretextual because "the factual dispute at issue [in a Title VII case] is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." Fuentes v. Perskie, 32 F.3d 759, 765 (3d Cir. 1994).   "'[T]he pertinent question in determining pretext is not whether the employer was right to think the employee engaged in

misconduct, but whether that belief was genuine or pretextual.'" Pastran, 210 F.3d at 1206 (quoting Hardy v. S.F. Phosphates L.C., 185 F.3d 1076, 1080 (10th Cir. 1999). "The test is good faith belief." McKnight, 149 F.3d at 1129. Accordingly, "[i]t is the manager's perception of the employee's performance that is relevant, not plaintiff's subjective evaluation of his own relative performance." Shorter, 188 F.3d at 1209.

For these reasons, Plaintiff cannot create evidence of pretext solely through his own evaluation of the reasons for his failure to complete all of his green-waste routes in December 2003 or his own testimony regarding what happened during the incident at the convenience store on Tuesday afternoon. The possibility that Defendants were mistaken in believing other witnesses' version of events instead of Plaintiff's version is not, in itself, sufficient to show pretext. If Defendants took disciplinary action against Plaintiff based on their belief that he intentionally slowed the pace of his work and was untruthful with regard to this alleged slowdown in his work, "such belief would not be pretextual even if the belief was later found to be erroneous." McKnight, 149 F.3d at 1129.

While there may be room for differences of opinion in assessing the credibility of witnesses and the weight of the evidence collected during Defendants' investigation of the December 2003 green-waste controversy, the conclusions that Defendants reached as a result of this investigation are not weak, implausible, or inconsistent enough to support a reasonable inference of pretext under Title VII. In this regard, I note that Defendants' ultimate findings are not totally lacking in evidentiary support, as there were independent witnesses (including Mr. Becerra and Ms. Wright) who provided testimony in support of

these findings and corroborated one another's testimony.  This case is not one in which the Defendants are relying on the allegations of a single biased witness or imposing their own unwritten subjective criteria to determine whether misconduct occurred.  Moreover, the evidence of record does not support a reasonable inference that Defendants changed their reasons for the investigation and resulting suspension, or offered inconsistent reasons for these actions.  The specific rules and regulations listed in the Pre-Determination Notice all relate to the alleged work slowdown during the first week of December 2005 and Plaintiff's subsequent statements and reports (including time sheets) regarding that period.

Plaintiffs' conclusory allegation that Defendants' investigation of the December 2003 green-waste controversy was "accusatory, threatening, and biased" does not amount to a showing of pretext.  The evidence of record indicates that Defendants employed standard procedures for investigating employee misconduct, in which Plaintiff was given notice, an opportunity to present his side of the story, and the opportunity to obtain the advice of counsel and/or a union representative.  [Mora Dep. at 105, 164-66.]  Further, Defendants hired outside investigators to conduct the investigation, and important interviews were transcribed.  [Ex. 12 to Mora Dep. attached as Ex. A to Doc. 46; Transcript attached to Becerra Aff.]

Despite these measures, Plaintiff claims that not all of the facts were investigated thoroughly during the initial inquiry, and he notes the absence or loss of a videotape that might have contained information regarding the Tuesday incident at the convenience store. [Gutierrez Dep. at 32; Mora Dep. at 32-33, 57-59.]  Such minor imperfections in the initial

investigation or pre-determination hearing do not create a material issue of fact concerning pretext or bias against Hispanic employees, especially where post-deprivation procedures are available for making corrections and bringing additional evidence to light.  See McKnight, 149 F.3d at 1128-29 (concluding that immaterial omissions or inconsistencies in the investigation of an employee's alleged misconduct did not give rise to a reasonable inference of pretext); Dean v. Boeing Co., 61 Fed. Appx. 576, 2003 WL 1439623, at *6 (10th Cir. 2003) (unpublished disposition reaching similar conclusion); cf. Hennigh v. City of Shawnee, 155 F.3d 1249, 1256 (10th Cir. 1998) (concluding that "a plaintiff is not entitled to an extensive or formal pre-termination hearing if there are adequate post-termination procedures," and that "grievance procedures provided by a collective bargaining agreement can satisfy a plaintiff's entitlement to post-deprivation due process").

There is also nothing in the evidence of record to support a reasonable inference that Defendant Ruiz or other City employees involved in the decision to suspend Plaintiff's employment made any disparaging remarks about his race or national origin during this process or altered their procedures so as to intentionally skew their investigation in favor non-Hispanic employees.  In this regard, the Court notes that both Defendant's immediate supervisor, Defendant Ruiz, and Mr. Becerra, the complaining witness whose statements prompted the investigation, are also Hispanic.  In addition, the majority of the recycling truck drivers identified in the evidence of record are Hispanic.  Under the circumstances, it is not reasonable to infer that these individuals would have singled out members of their own race or national origin for mistreatment, nor is there statistical evidence that Defendants were

targeting a small group of employees whose race or national origin differed from the majority.

Nevertheless, Plaintiff alludes in his deposition testimony to the utterance of one or more racial slurs by an unnamed supervisor or foreman within the SWMD.[3]   [Mora Dep. at 61-62, 255-56.]  Although comments evincing an improper bias or prejudice may provide circumstantial evidence of a discriminatory employment decision, see Shorter, 188 F.3d at 1209-10, the Tenth Circuit has emphasized that the statements in question must be "made by the decision maker," and that "there must be a nexus between the discriminatory statements and the [hiring] decision," McKnight, 149 F.3d at 1128; accord English, 248 F.3d at 1010. Without such a nexus to the decision-making process, racially derogatory statements by other employees must be treated as "stray remarks" rather than evidence of discrimination or retaliation.  See McKnight, 149 F.3d at 1129.

In this case, the alleged slur(s) were "stray remarks."  They were not directed at Plaintiff, and Plaintiff's deposition testimony sheds no light on how the utterance of any racial slur(s) bears a significant relationship to the December 2003 green-waste controversy or the ensuing investigation that resulted in his thirty-day suspension.  Moreover, the record

---

[3]The Court considers the statements of other City personnel that Plaintiff personally heard insofar as they constitute vicarious admissions by a party opponent concerning matters within the scope of their employment and were made during the course of their agency or employment relationship with Defendant City of Albuquerque.  See Fed. R. Evid. 801(d)(2)(D); Pastran, 210 F.3d at 1203 n.1.  To the extent that these statements are not admissions by a party opponent, the Court considers them insofar as they are introduced for the purpose of showing the declarant's then existing state of mind.  See Wright, 187 F.3d at 1304 n.21; Pastran, 210 F.3d at 1203 n.1.

does not reflect that Plaintiff ever reported the alleged racial slur(s) or engaged in any other protected activity regarding such an alleged racial slur during the relevant time period. For these reasons, Plaintiff's deposition testimony on this topic does not create a disputed issue of material fact as to whether his thirty-day suspension was pretextual or otherwise motivated by racial animus.

Plaintiff's deposition testimony also contains various remarks about Defendant Ruiz's demeanor and treatment of him during or after the investigation of the December 2003 green-waste controversy, such as Defendant Ruiz's failure to shake his hand on occasion and his decision to reassign Plaintiff to an older-model truck for three months. This testimony does not support a reasonable inference of pretext or any racial animus against Hispanic employees because Plaintiff has not shown that Defendant Ruiz treated non-Hispanic employees any differently in these respects, or that the instances mentioned above had any causal nexus to Plaintiff's suspension. See Salguero, 366 F.3d at 1177-78. There is no evidence of record that Defendant Ruiz (who is Hispanic) only shook the hands of non-Hispanic employees. The newer-model truck that was taken away from Plaintiff on December 8, 2004, was temporarily reassigned to another, Hispanic employee (Ken Zubia) who finished his green-waste routes on time. [Handwritten notes attached to Ex. 24 to Doc. 54; Mora Dep. at 30-31.] Similarly, Plaintiff's complaints about the frequency with which he is assigned to train other employees or designated as "acting foreman" do not evince any racial animus against Hispanic employees because there is no evidence of record that non-

Hispanic employees were given such assignments with greater frequency.  [Mora Dep. at 83-86; Doc 52, at ¶¶ 42-44; Doc. 46, at ¶¶ 42-44.]

I conclude that the evidence of record does not support a reasonable inference that Defendants' reasons for the disciplinary actions in question are pretextual or that discrimination based on race or national origin were motivating factors in these actions.  For all of the above reasons, Defendants are entitled to summary judgment on Plaintiff's Title VII discrimination claim, and this claim must be dismissed with prejudice.

### 2.   **Plaintiff's Title VII Retaliation Claim**

The Court next turns to Plaintiff's claim that Defendants retaliated against him for engaging in activity that is protected under Title VII of the Civil Rights Act.   Plaintiff does not offer direct evidence of such retaliation.  In order to establish a prima facie case of retaliation by means of circumstantial evidence, Plaintiff must show "(1) that . . . [he] engaged in protected activity as defined above; (2) that the employer took an adverse employment action against the plaintiff; and (3) that there exists a causal connection between the protected activity and the adverse action."  Aquilino, 268 F.3d at 933.

For the reasons previously stated in the discussion of Plaintiff's Title VII discrimination claim, the only "adverse employment action" at issue here is the thirty-day suspension that Defendants imposed on or about February 12, 2004, as a result of the investigation initiated on or about December 5, 2003.  [Ex. 9 to Mora Dep. attached as Ex. A to Doc. 46.]  With respect to this thirty-day suspension, Plaintiff fails to establish a prima facie case of retaliation under Title VII because the evidence of record does not support a

reasonable inference that this adverse employment action has a causal relationship to any protected activity under Title VII.

Viewing the evidence of record in the light most favorable to Plaintiff, the earliest date on which Plaintiff may have engaged in activity protected by Title VII is January 8, 2004, the date of his counsel's fax to the City's Risk Management Division containing allegations of discrimination based on race or national origin.[4]  [Ex. 24 to Doc. 24.]  While it is true that counsel's letter does not constitute a formal complaint with the EEOC or a similar agency, the Tenth Circuit has held that "protected activity" under Title VII may also encompass informal complaints to supervisors about workplace discrimination on the basis of race, color, religion, sex, or national origin, including letters from an attorney submitted on an employee's behalf.  See, e.g., O'Neal v. Ferguson Constr. Co., 237 F.3d 1248, 1255 (10th Cir. 2001).  Counsel's letter qualifies as such an informal complaint submitted on Plaintiff's behalf.

Whether this activity is protected under Title VII does not depend on the merits of the underlying complaint of discrimination stated in the letter.  All that is required in this context is "a reasonable good-faith belief" that the "underlying conduct" violated Title VII's prohibition against discrimination based on race, color, religion, sex, or national origin.  See Crumpacker v. Kansas Dep't of Human Resources, 338 F.3d 1163, 1172 (10th Cir. 2003).

---

[4]The Court considers counsel's letter not for the truth of the matters asserted therein but in order to show its effect on the recipient(s), i.e., giving them notice that Plaintiff was opposing an employment practice alleged to violate Title VII.  See generally Faulkner, 3 F.3d at 1434.

Thus, the Court's decision to grant Defendants' summary-judgment motion on Plaintiff's Title VII discrimination claim does not necessarily preclude him from proceeding with a Title VII retaliation claim.

On the other hand, an activity must at least place the employer on notice that the employee is opposing some employment practice relating to race, color, religion, sex, or national origin in order to warrant protection under Title VII.  "Opposition to an employer's conduct is protected by § 2000e-3(a) only if it is opposition to a 'practice made an unlawful employment practice by [Title VII].'  Title VII does not prohibit all distasteful practices by employers."  Petersen v. Utah Dep't of Corrections, 301 F.3d 1182, 1188 (10th Cir. 2002). Specifically,  Title VII only protects "classes relating to 'race, color, religion, sex, or national origin.'  Discrimination based upon other characteristics or factors is not prohibited by Title VII."  Flasher Co., 986 F.2d at 1316 n.4; accord Petersen, 301 F.3d at 1188; Robbins v. Jefferson County Sch. Dist. R-1, 186 F.3d 1253, 1258 (10th Cir. 1999), abrogated in part on other grounds by Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101 (2002).

The letter from Plaintiff's counsel dated January 8, 2004, is the first instance of an informal complaint that involves a specific category of unlawful discrimination covered by Title VII (i.e., race, color, religion, sex, or national origin).  The evidence of record concerning Plaintiff's statements or complaints about the green-waste collection before the letter dated January 8, 2004, do not provide the basis for a retaliation claim under Title VII because these statements or complaints did not involve any "practice made an unlawful employment practice" by Title VII.  See 42 U.S.C. §§ 2000e-2, 2000e-3(a).  Rather,

Plaintiff's comments to his employer that predate his counsel's letter of January 8, 2004, were generic complaints of "unfair conduct" that did not refer to any employee's race or national origin. Petersen, 301 F.3d at 1188. [Mora Dep. at 160-61.]

While it may be the case that one or more of these earlier comments concerned Plaintiff's "perceived involvement in union activities" and were arguably protected by the First Amendment or other laws, the only federal civil-rights law that is the subject of Plaintiff's *Complaint* in this action is Title VII of the Civil Rights Act. The definition of "protected activity" under this specific statute is not broad enough to include the type of generic complaints of unfair employment practices or union-related grievances that predate Plaintiff's counsel's letter of January 8, 2004. See Balderas v. La Casita Farms, Inc., 500 F.2d 195, 198-99 (5th Cir. 1974).

To the extent that Plaintiff did make comments about the role of race or national origin in his workplace before January 8, 2004, there is no evidence of record that such comments were communicated to the supervisory personnel involved in the investigation of the December 2003 green-waste controversy or the decision to impose the thirty-day suspension in February 2004. Whether such individuals knew that he was engaging in this protected opposition is "crucial" to his retaliation claim because "Section 2000e-3(a) bars retaliation by an employer only if it is 'because [the employee] has opposed any practice made an unlawful employment practice by [Title VII].' An employer's action against an employee cannot be because of that employee's protected opposition unless the employer

-34-

knows the employee has engaged in protected opposition." Petersen, 301 F.3d at 1188 (citations omitted).

Based on the indication that it was copied to the SWMD's Director, it may be reasonable to infer that counsel's letter of January 8, 2004, made its way to Defendant Ruiz or other City employees involved in the actions that resulted in Plaintiff's thirty-day suspension. But the evidence of record does not support such an inference with respect to these individuals' knowledge or awareness of any complaints based on race or national origin that Plaintiff might have made before that date.

Because January 8, 2004, is the first date on which Plaintiff engaged in protected activity under Title VII, it follows that actions which Defendants initiated before that date cannot be a cause for any retaliation that is actionable under that statute. See Morgan, 108 F.3d at 1324; Vigil v. Colo. Dep't of Higher Educ., 185 F.3d 876, 1999 WL 407479, at *5 (10th Cir. 1999) (unpublished disposition concluding that "temporal proximity [is] insufficient to establish pretext when disciplinary action had begun prior to the protected activity"); Philips v. Hemsing Semiconductors, 185 F.3d 874, 1999 WL 476017, at *4 (10th Cir. 1999) (unpublished disposition reaching similar conclusion). In particular, the evidence of record does not support a reasonable inference that Defendants' investigation of the work slowdown which resulted in Plaintiff's thirty-day suspension without pay is causally related to Plaintiff's activity protected under Title VII because the investigation of the work slowdown was initiated and in progress well before the letter from Plaintiff's counsel dated January 8, 2004. Indeed, this letter from Plaintiff's counsel is written in response to that

investigation, which was already ongoing at the time the letter allegedly was delivered. The additional proceedings, followed by the imposition of the thirty-day suspension "simply completed the disciplinary process already set in motion" by the investigation that commenced on December 5, 2003. Morgan, 108 F.3d at 1324. For these reasons, Plaintiff fails to establish a prima facie case of retaliation under Title VII.

Assuming for purposes of analysis, however, that Plaintiff has established a prima facie case of retaliation, the burden would shift to Defendants to produce evidence of legitimate, non-discriminatory reasons for their decision to impose the thirty-day suspension. See Pastran, 210 F.3d at 1206. Defendants have met this burden of production by presenting evidence that they imposed the thirty-day suspension because of Plaintiff's involvement with the alleged work slowdown and his alleged dishonesty regarding that slowdown. A jury could reasonably infer from the evidence of record that Defendants had a legitimate basis for concluding that Plaintiff engaged in a work slowdown and was not truthful about the work slowdown--particularly the length and purpose of the Tuesday incident at the convenience store-- because his version of events conflicts with that of other witnesses who had fewer motives to lie.

As Defendants have met their burden of producing evidence of legitimate, non-discriminatory reasons for their  decisions, it is Plaintiff's burden to show that there is a genuine issue of material fact as to whether the reasons proffered by Defendant are pretextual. See Pastran, 210 F.3d at 1206. The Court concludes that Plaintiff has not met this burden with respect to his Title VII retaliation claim.

The temporal proximity between an employee's protected conduct and an adverse employment action "is not sufficient by itself to raise an issue of fact" regarding pretext, Pastran, 210 F.3d at 1206, especially where the adverse employment action "simply completed the disciplinary process already set in motion" by an investigation that preceded the protected conduct.  Morgan, 108 F.3d at 1324.  For the reasons previously stated in the discussion of his Title VII discrimination claim, Plaintiff also has failed to come forward with evidence showing the type of weaknesses, inconsistencies, or irregularities in Defendant's activities after January 8, 2004, that would support a reasonable inference of pretext or retaliatory motive.  Thus, Defendant is entitled to summary judgment on Plaintiff's Title VII retaliation claim as well.

### D.   Plaintiff's State-Law Claims

Defendants assert that they also are entitled to summary judgment on the remaining state-law claims asserted in Plaintiff's *Complaint*.  Because these claims arise under state law, they are before this Court only by virtue of the supplemental jurisdiction conferred by 28 U.S.C. § 1367(a).  "The district courts may decline to exercise supplemental jurisdiction over a claim under [28 U.S.C. § 1367](a) if . . . the district court has dismissed all claims over which it has original jurisdiction."  28 U.S.C. § 1367(c)(3).

Having granted summary judgment on all of Plaintiff's claims arising under federal law, the Court declines to exercise supplemental jurisdiction over Plaintiff's remaining state law claims.  See 28 U.S.C. § 1367(c)(3); United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 726 (1966).  In so declining, the Court has considered whether the nature and extent of

pretrial proceedings, judicial economy, convenience, and fairness would be served by retaining jurisdiction.  See Anglemyer v. Hamilton County Hosp., 58 F.3d 533, 541 (10th Cir. 1995).  The Court is not convinced that these factors weigh in favor of retaining jurisdiction.  In this regard, the Court notes that an arbitration proceeding is already pending in another tribunal, and any state-law claims that Plaintiff may wish to pursue are likely to be intertwined with the available procedures for challenging his suspension under his union contract or municipal ordinances.   Notions of comity and federalism demand that a state court try such claims in the first instance, absent compelling reasons to the contrary.  See Thatcher Enters. v. Cache County Corp., 902 F.2d 1472, 1478 (10th Cir. 1990).  In addition, the Court's decision not to exercise supplemental jurisdiction is not necessarily fatal to Plaintiff's state-law claims, as 28 U.S.C. § 1367(d) may provide for the tolling of any limitations period regarding these claims.

## III.    **CONCLUSION**

For the foregoing reasons, the Court concludes that Defendants are entitled to summary judgment on Plaintiff's claims of discrimination and retaliation under Title VII of the Civil Rights Act, and these claims must be dismissed with prejudice.  All of Plaintiff's remaining claims, which arise under state law, must be dismissed without prejudice for lack of jurisdiction.

**IT IS, THEREFORE, ORDERED** that *Defendant's Motion for Summary Judgment* [Doc. No. 45] is **GRANTED**.

-38-

**IT IS FURTHER ORDERED** that Plaintiff's claims of discrimination and retaliation under Title VII of the Civil Rights Act are **DISMISSED WITH PREJUDICE**.

**IT IS FURTHER ORDERED** that all of Plaintiff's remaining claims, which arise under state law, are **DISMISSED WITHOUT PREJUDICE** for lack of jurisdiction.

**IT IS FURTHER ORDERED** that the **PRETRIAL CONFERENCE** set for TUESDAY, October 4, 2005, at 9:00 a.m., the **CALL OF THE CALENDAR** set for THURSDAY, November 3, 2005, at 9:00 a.m., and the **JURY SELECTION/TRIAL** set for WEDNESDAY, November 9, 2005, at 9:00 a.m. are hereby **VACATED**.

**SO ORDERED**, this 27th day of September, 2005, in Albuquerque, New Mexico.

**M. CHRISTINA ARMIJO**
United States District Judge

-39-